# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-3942

_____

William Hanes,                                   *
                                                 *
            Appellant,                           *
                                                 *     Appeal from the United States
            v.                                   *     District Court for the
                                                 *     Eastern District of Missouri.
David Dormire, Superintendent,                   *
                                                 *
            Appellee.                            *

_____

Submitted:  June 16, 2000
    Filed:  February 15, 2001

_____

Before BOWMAN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and
    O'BRIEN,[1] District Judge.

_____

BOWMAN, Circuit Judge.

William Hanes appeals from the order of the District Court[2] denying his petition
for a writ of habeas corpus under 28 U.S.C. § 2254.  The District Court issued a
certificate of appealability (COA) under 28 U.S.C. § 2253 on a single issue, namely

_____

[1]The Honorable Donald E. O'Brien, United States District Judge for the Northern
District of Iowa, sitting by designation.

[2]The Honorable Catherine D. Perry, United States District Judge for the Eastern
District of Missouri.

whether Hanes's counsel was constitutionally ineffective in preparation for trial.[3]  We affirm.

## I.

A jury found Hanes guilty of the first degree murder of John F. Barlow.  In short, the evidence adduced at trial showed that Hanes and Robert Sprouse, who testified against Hanes at trial, injected Barlow with a cleaning fluid called Energine and then robbed Barlow's apartment.  Hanes admitted to being at the apartment at the time of the

---

[3]This is our characterization of the issue.  The District Court referenced part (d) of the eighth argument in Hanes's petition in issuing the COA, and thus the certificate covers the substance of the following allegations:

> Trial counsel failed to consult with Petitioner in sufficient time to prepare a defense.  Specifically, counsel met with Petitioner only twice, for a total of one hour, prior to the trial.  Counsel also failed to adequately inform Petitioner of possible defenses to the charge, and failed to contact witnesses provided by Petitioner and necessary to present a defense to the allegations.  Trial counsel also failed to provide Petitioner with information concerning the nature of the allegations against him and failed to discuss with Petitioner police reports and other disclosed materials that he had obtained.

Petition for Writ of Habeas Corpus at 24; see also Hanes v. Dormire, No. 4:95CV2402 CDP, at 20-21 (E.D. Mo. Sept. 29, 1999).

The Supreme Court has spoken recently on the COA issue, and has determined that when a petitioner seeks to appeal the dismissal of a habeas petition after the effective date of AEDPA (April 24, 1996), the right to appeal is governed by the COA requirements found at 28 U.S.C. § 2253(c), whether the habeas petition was filed in the district court pre- or post-AEDPA.  Slack v. McDaniel, 120 S. Ct. 1595, 1600 (2000).  Because Hanes filed his Notice of Appeal in October 1999, AEDPA's COA requirements govern his appeal.  See id.

murder and to taking some of Barlow's property, but claimed that Sprouse committed the murder while Hanes was waiting outside the front door to discuss a business deal with Barlow and that he did not know what Sprouse used to kill Barlow. Other than the testimony of Sprouse, the key evidence against Hanes was police testimony that he told police that Energine was used to kill Barlow,[4] and that only after Hanes provided this information were the police able to determine the exact cause of death.

## II.

Because Hanes's habeas petition was filed in 1995 before the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA), this appeal is subject to pre-AEDPA standards of review. See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Owens v. Dormire, 198 F.3d 679, 681 n.2 (8th Cir. 1999), cert. denied, 120 S. Ct. 2725 (2000). Accordingly, we "give deference to the findings of the state court and the burden is on the petitioner to 'establish by convincing evidence that the factual determination of the state court was erroneous.'" McDowell v. Leapley, 984 F.2d 232, 233 (8th Cir. 1993) (quoting Sumner v. Mata, 449 U.S. 539, 545 (1981)). As is always the case, we review the District Court's legal conclusions de novo and its factual

---

[4]After Sprouse confessed to his involvement in the murder, the Clayton Police Department had Sprouse confront Hanes in their presence. According to the testimony of Captain James Humphrey, one of the officers present at the confrontation, when Sprouse told Hanes that he had told police that Hanes jumped on Barlow and injected him in the arm with a needle, Hanes responded, "I didn't jump on his chest, that [Sprouse] premeditated the plan to murder." Trial Transcript at 451. Captain Humphrey further testified that when he asked Hanes what was injected, Hanes stated, "Energine," thus directly contradicting his story that he was not involved and did not know what had been used to murder Barlow.

findings for clear error.[5]  See id.; Couch v. Trickey, 892 F.2d 1338, 1341 (8th Cir. 1989).

The Missouri Court of Appeals addressed Hanes's ineffective assistance of counsel claim in affirming the circuit court's denial of his motion for post-conviction relief.  With respect to Hanes's claim that his counsel was ineffective in preparation for trial, the court described, and adopted, the motion court's factual findings as follows:

> The motion court found that trial counsel obtained copies of all police reports and provided the reports to movant's mother with the understanding that she would give them to movant and that trial counsel met with movant four times for a total of more than two hours in jail and two other times at the County Courthouse and spoke with movant on the phone numerous times.  The motion court further found that, during the course of these conversations, trial counsel discussed the state's case and possible defenses and that trial counsel believed from movant's comments that he was aware of the contents of the police reports.  The motion court found that trial counsel conducted an independent investigation of the case and personally interviewed the state's witnesses, lay witnesses and movant's co-workers.  These findings are supported by the record and are not clearly erroneous.

---

[5]In deciding this case, we have reviewed the sealed transcript of an in camera examination of Sprouse's counsel for its bearing on the ineffective assistance claim before us.  Sprouse's counsel had indicated that she had reason to believe that Hanes's counsel was ineffective, but refused to explain further due to her obligation under the attorney-client privilege.  Sprouse was deceased, having died in 1988.  The District Court held an in camera examination of Sprouse's counsel to determine whether it was necessary to abrogate the privilege in order to protect Hanes's constitutional rights.  The court refused to abrogate the privilege and then sealed the examination transcript.  Because we believed this ruling could have had some bearing on the ineffective assistance claims before us, we reviewed the transcript.  Having done so, we are convinced that the privilege should remain in force and the transcript remain sealed.

. . . The motion court found that prior to trial movant and his counsel discussed witnesses to be called at trial, and counsel decided to call six witnesses who he felt would benefit movant. The motion court further found that counsel discussed other potential witnesses and their testimony with movant but chose not to call additional witnesses as matters of trial strategy.

Hanes v. State, No. 58764, at 7-8 (Mo. Ct. App. Feb. 18, 1992). The District Court's description of the post-conviction record is substantially the same.[6] Having performed yet a third thorough review of the post-conviction record, we are satisfied that the state court factual findings are entitled to deference in accordance with the pre-AEDPA version of 28 U.S.C. § 2254(d) (1994).

Given these findings, we must decide whether Hanes's allegations amount to constitutionally defective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668 (1984). Hanes must show that his counsel's performance fell outside the wide range of professionally competent assistance and that "there is a

---

[6] The District Court described the record as follows:

The post-conviction hearing record shows that trial counsel met with petitioner before trial at least two times for a total of two hours at the St. Louis County Jail, two other times at the courthouse, and spoke with petitioner on several other occasions over the telephone. Counsel also met with petitioner at the jail two days after the trial had begun. Trial counsel provided copies of the police reports to petitioner's mother and relied on her to give copies to petitioner. Trial counsel testified at petitioner's post-conviction hearing that, during his meetings with petitioner, he specifically discussed with him all the evidence against him and possible defenses, discussed the police reports, and discussed and explained the same to petitioner's family.

Hanes, No. 4:95CV2402 CDP, at 17-18.

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

First, we deal with Hanes's allegations that his counsel was ineffective in failing to fully and adequately consult with him. Specifically, Hanes alleges that his counsel failed to consult with him in sufficient time to prepare a defense, failed to adequately inform him of possible defenses to the charges, failed to provide him with information concerning the nature of the allegations against him, and failed to discuss with him police reports and other disclosed materials obtained. While there was conflicting evidence on some of these allegations—mainly on whether counsel adequately discussed the case with Hanes—we believe, as we stated earlier, that there was sufficient evidence presented at the post-conviction hearing to support the state court's finding that "trial counsel discussed the state's case and possible defenses and that trial counsel believed from movant's comments that he was aware of the contents of the police reports." Hanes, No. 58764, at 7.

Counsel testified at the post-conviction hearing that he provided copies of the police reports to Hanes's mother, that she indicated that she would provide copies to Hanes, and that "when [he] did review the matter with [Hanes] either at the courthouse itself or at the jail, [he] was assured that [Hanes] understood both the nature of the charges against him and, generally speaking, what evidence they had against him." Transcript of Post-Conviction Relief Hearing at 348-49. Counsel also testified that he reviewed the reports and potential witness testimony with Hanes:

> . . . We had reviewed the reports. We had ample opportunity to know what each of the witnesses were going to say and what answers we were going to try to present in answer to them . . . .
> . . . Sir, I can remember sitting in a conference room with Mr. Hanes again reviewing the witnesses that were going to come and specifically dealing with the questions that were going to be raised about the Energine . . . .

Transcript of Post-Conviction Relief Hearing at 370. We do not believe that counsel's several meetings with Hanes before trial at the St. Louis County Jail, the courthouse, and over the telephone in which he discussed the charges and the evidence with Hanes were constitutionally insufficient.

Second, Hanes alleges that counsel failed to contact witnesses necessary to the defense. Hanes provided long lists of potential witnesses to counsel. Of those potential witnesses, only four testified at the post-conviction hearing as to what their testimony would have been at trial: Alison Hanes, Virginia Hanes, Gary Seiner, and Gary Smith. Hanes's wife, Alison Hanes, was prepared to testify that a life insurance policy on her had lapsed in order to rebut evidence that Hanes planned to kill her in order to obtain insurance proceeds. Hanes's mother, Virginia Hanes, was prepared to testify to an alternate version of an ambiguous statement that the State argued was tantamount to a confession.[7] Hanes's friend, Gary Seiner, was prepared to testify that Hanes often went to Chicago to visit him in order to rebut Sprouse's testimony that Hanes went to Chicago to sell stolen property. Finally, Sprouse's short-term roommate, Gary Smith, was prepared to testify that Sprouse threatened him.

We do not believe that counsel's failure to consult with these potential witnesses prior to trial amounts to constitutionally defective assistance of counsel. "Decisions relating to witness selection are normally left to counsel's judgment, and 'this judgment

---

[7] Hanes called his mother from the police station to tell her that the police would be coming for a suitcase filled with the victim's property. Captain Humphrey testified that at the close of the conversation Hanes stated, "no, mom, that is not all. It's worse. Please tell Alison to bring my medication and please send my prayerbook and pray for me." Trial Transcript at 452-53. At closing argument, the state argued that an innocent man would have told his mother that he didn't commit the crime. Virginia Hanes was prepared to testify that Hanes said, "oh, Mom, Mom. They're accusing me." Transcript of Post-Conviction Relief Hearing at 169.

will not be secondguessed by hindsight.'" Williams v. Armontrout, 912 F.2d 924, 934 (8th Cir. 1990) (en banc) (quoting Frank v. Brookhart, 877 F.2d 671, 674 (8th Cir. 1989)), cert. denied, 498 U.S. 1127 (1991).  While some of the potential witnesses' testimony could have been helpful in rebutting or clarifying some collateral evidence, we do not believe any of the proffered testimony was so important as to put counsel's failure to consult with or call these witnesses outside the wide bounds of strategic choices that counsel is afforded.  The testimony of Alison Hanes was unnecessary as allegations that Hanes plotted to kill her for insurance money never reached the jury. See Trial Transcript at 292-94.[8]  The testimony of Virginia Hanes could have clarified Hanes's statements to her on the phone, but the state's interpretation of the conversation as a confession was obviously debatable, and counsel attacked that interpretation in closing argument.  The testimony of Gary Seiner could have provided an alternate explanation for Hanes's trips to Chicago, but would not have directly contradicted Sprouse's testimony that Hanes sold stolen property there—a matter that was, at most, peripheral to the central issues at trial.  Finally, although counsel failed to consult with Gary Smith before trial, he was at the trial and did testify that Sprouse threatened him.

In any case, the main strategy employed by counsel was to attack the credibility of Sprouse, who in fact had rather serious credibility problems.  Given the nature of the case, essentially a swearing match between Hanes and Sprouse over who planned and

---

[8]Attempts by the prosecution to put this evidence in front of the jury met with repeated objections by defense counsel that were sustained each time.  Trial Transcript at 292, 294, 503-505, 559-563.  Only once was an objection to a tangentially-related question overruled.  Trial Transcript at 294 (allowing prosecutor to ask Sprouse if Hanes had threatened other people, to which Sprouse responded that Hanes had threatened his wife).  Also, at one point during Sprouse's testimony he answered an improper question to which defense counsel immediately objected; that objection was sustained. Trial Transcript at 292 (responding to prosecution's question, Sprouse stated that Hanes told him of plans to kill his wife and in-laws).  These instances do not amount to the trial court's having allowed evidence of a plot by Hanes to kill his wife for insurance money to come before the jury, as suggested by the dissent.

carried out the murder after both men admitted to being at the scene and stealing the victim's property, we believe this strategy was reasonable. Counsel discussed this strategy with Hanes and, in fact, did considerable preparation for this aspect of the trial, including taking Sprouse's deposition:

> . . . We [Hanes and his counsel] spent a lot of time talking about the credibility of Mr. Sprouse. I know I talked to Mr. Hanes [sic] mother and father repeatedly about Sprouse's lack of credibility. We also did some background work on Mr. Sprouse and in taking his deposition . . . .

> . . . As I recall, at that time I had several associates and we reviewed—if I'm not mistaken, Mr. Sprouse had faked his own death and I think we came into possession of that information and we used that not only—I know we used it at the time of the trial or attempted to set it into the evidence to destroy his credibility in that regard.

Transcript of Post-Conviction Relief Hearing at 350-51. Overall, then, we cannot say that counsel's consultations with Hanes and his decision to not contact several potential witnesses, especially given his main trial strategy of attacking Sprouse's testimony, fell outside the wide range of professionally competent assistance.

Even assuming that counsel was ineffective, we believe that there is not "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. None of the allegations of ineffective assistance that are before us had any effect on the central evidence against Hanes—that the police were able to determine the exact cause of death only after hearing the name of the poison, Energine, out of Hanes's own mouth. At the post-conviction hearing, counsel stated:

> The problem that we had throughout the trial [was] the fact that the Medical Examiner's Office claimed that the only way they knew to look for the cleaning fluid in the blood system came from Mr. Hanes. And the

-9-

testimony of the officers who were involved originally and the Medical Examiner's Office when they came on gave us a hurdle that was rather difficult because they indicated prior to talking to Mr. Hanes they had not been able to determine cause of death and that it was only through a comment from him that led them to the testing for the cleaning fluid in the blood.

Transcript of Post-Conviction Relief Hearing at 361. Hanes's statement that Energine was the name of the poison both implicated him in the murder and directly contradicted his story that he was outside the apartment at the time and did not know how Barlow had been killed. Given this strong evidence, we believe Hanes cannot show prejudice within the meaning of <u>Strickland</u> and thus cannot satisfy the second part of the <u>Strickland</u> test.

Accordingly, the judgment of the District Court is affirmed.

**O'BRIEN, SENIOR DISTRICT JUDGE, dissenting.**

Article I, Section 9 of the Constitution reads; "The privilege of the Writ of Habeas Corpus shall not be suspended unless when in cases of rebellion or invasion the public safety may require it."

Today, as in prior centuries, the writ is a bulwark against convictions that violate "fundamental fairness." <u>Engle v. Isaac</u>, 456 U.S. 107, 126, 102 S. Ct. 1558, 71 L.Ed. 2d 783 (1982), quoting <u>Wainright v. Sykes</u>, 433 U.S. 72, 96-97, 97 S. Ct. 2497, 53 L.Ed. 2d 594 (1977) (Stevens, J., concurring). Based on the record, I am unwilling to condone what I believe was a conviction in Hanes' case that violates "fundamental fairness."

The errors by the lower courts in this case include, but are not limited to: a clear error of law in misconstruing the attorney-client privilege law. Further, they clearly applied inapplicable law in considering the issue of the limits of leeway in allowing trial counsel to use, as an excuse, "trial strategy," when counsel

erroneously failed to call Hanes' mother and wife to easily refute a claim that Hanes had confessed, and that Hanes had told the star witness against him that he was going to kill his wife for money; further, in buying everything that trial counsel Mr. G said he had done to assure good representation of Hanes when the state of Illinois and Missouri had both suspended Mr. G for 42 months for his awful handling of clients in the exact way Hanes swears Mr. G treated him.

I apologize for the length of this dissent. The <u>Strickland</u> court clearly states that, "a court hearing an ineffectiveness claim must consider the totality of the evidence." <u>Strickland</u>, 466 U.S. 668 at 695. No dent can be made in the conclusions of the majority without setting out the record.

## STATEMENT OF FACTS

On October 30, 1981, John F. Barlow, about 80 years old, was found dead in his apartment in St. Louis, Missouri. Six weeks prior to his death, a man using the name Steve Romer had moved into Barlow's apartment. Romer, whose real name was Robert Sprouse, had come to St. Louis in August of that year traveling in a car he had stolen from Sandusky, Ohio. On October 28, 1981, the night of Barlow's death, the garage man at the decedent's apartment building saw Sprouse and a companion whom he initially identified as Mark DuFrenne, Sprouse's homosexual lover. Sprouse and DuFrenne were seen by the garage man loading luggage into Barlow's automobile. Sprouse took Barlow's car and some personal property from Barlow's home.

Sprouse pled guilty and later testified against Hanes after he had negotiated a deal with the State to reduce his crime to murder in the first degree (felony murder) with assurance of a sentence that would not include the death penalty. In his testimony, Sprouse stated that he had met Hanes in August of 1981 and met the deceased some weeks after that. At first, things went well between the deceased and Sprouse, but eventually, the deceased became jealous of Sprouse's new lover, DuFrenne, and tension in the decedent's household increased. Sprouse testified that he and Hanes began planning to kill Barlow and steal his property. Sprouse had, before this time, stolen household silver from Barlow, sold it, and kept the proceeds.

He had also cashed checks for five thousand two hundred dollars ($5,200.00) drawn on Barlow's account. Hanes admits that he forged Barlow's signature on a five thousand dollar ($5,000.00) check, at the request of Sprouse.

According to Sprouse, Hanes suggested that Sprouse poison Barlow, and toward that end, Sprouse says Hanes supplied Sprouse with poison to be put into the victim's food.

During this time, Sprouse was addicted to cocaine and speed and was ingesting mind-altering drugs. From October 28th, the day of Barlow's death, to November 3rd, Sprouse consumed five thousand dollars ($5,000.00) worth of drugs. His drug addiction was further aggravated by an impending nervous breakdown and suggestions of a multiple personality psychosis. Nonetheless, the fragile state of his mental health did not impede his criminal functioning. After the murder, he arranged a flight out of St. Louis which was a decoy reservation that he never used. He made sure that the decedent's maid would not report to work the next day on October 29th, and at the same time told her he was stealing Barlow's stock certificates and figurines. He also attempted to make arrangements for her to testify for him, if necessary, promising her something pretty if she cooperated. He disconnected the decedent's phone and drove to Minneapolis in a car stolen from the deceased victim. Shortly thereafter, Sprouse was captured in Minneapolis. He initially denied involvement in Barlow's death, but later told police he "might" have done the killing. The next day, he implicated Hanes. Sprouse testified that Hanes filled the syringe with cleaning fluid, jumped Barlow, and injected him. Laboratory tests of Barlow's body fluids for Energine were positive. Armed with this information, Hanes was arrested.

Hanes admitted to being at the apartment at the time of the murder and to taking some of Barlow's property, but claimed that Sprouse committed the murder while Hanes was waiting outside the front door to discuss a business deal with Barlow and that he did not know what Sprouse used to kill Barlow. Other than the testimony of Sprouse, the key evidence against Hanes was that he allegedly told police that Energine was used to kill Barlow, and that only after Hanes provided this

information were the police able to determine the exact cause of death.  Hanes specifically denies this claimed admission.  Hanes had no criminal record of any kind.

## CERTIFICATION OF ISSUES TO THIS COURT

As set out in the District Court's order of September 29, 1999, the petitioner sought habeas corpus relief as to nine separate categories.  On pages 8 of the Court's order it states:

> Nothing in this cases would have put the state court on notice that petitioner intended to raise a federal claim in his brief.  Thus, in its plain error review of grounds one, three, four, five, and seven, the Missouri Court of Appeals only reviewed state-law issues.  Such review does not cure the procedural default with respect to the federal aspects of petitioner's claims.  Sweet v. Delo, 125 F. 3d 1144, 1153 (8th Cir. 1997).  Therefore, federal habeas review of grounds one, three, four, five, and
>
> seven is barred, unless petitioner can show cause and prejudice or actual innocence to overcome the procedural bar.

This procedural bar, of course, was another glaring error by appellate counsel because shortly after getting appointed, said counsel had failed to file a motion for a new trial thereby creating the procedural bar.  This error and others set out herein by appellate counsel were not certified to this Court, but must be included to demonstrate that the whole proceedings have been fundamentally unfair.

It should be noted that the District Court's opinion starts discussing the certified claim, paragraph 8d, on page 17 of its order and concludes discussing 8d on page 20, taking almost 20% of the length of the ruling.  These pages discuss in detail what the judge considered to be included in 8d.  That discussion includes discussion of matters specifically involved in paragraphs 3, 8a, 8b, 8c, and 8d.  (For

-13-

a description of what the paragraphs pertain to, see below). That is what the reviewing judge considered to be part of 8d. Therefore, there should be no argument that, as part of 8d, they were included in the certification.

On page 7 of its opinion, the Missouri Court of Appeals specifically sets out that its consideration of the ineffective assistance of counsel claim includes the claim that counsel failed to prepare for trial, conduct an adequate investigation, consult with Hanes, and failed to interview and call several witnesses. If the District Court had gone by the rule that what is fairly presented to the State Court should be certified, then paragraphs 8a, 8b, 8c, and 8g and a Brady claim, not just paragraph 8d, should have been certified.

With claims one, three, four, five, and seven procedurally barred, it left claim number 3:

>The trial court erred in allowing the prosecution to elicit testimony regarding unsubstantiated allegations that petitioner planned to kill his wife and in-laws for

>financial gain; (This was discussed under 8d in District Court's Order, page 19).

Claim number 8: (including only those claims still urged by appellant)

>Petitioner was denied effective assistance of counsel because trial counsel failed:

>>(a) To interview, investigate or locate witnesses on petitioner's behalf or to subpoena records; (Discussed pp. 18-19).

>>(b) To secure all discovery material from the prosecution, to obtain materials from the prosecution which would tend to negate or mitigate petitioner's guilt on punishment, to properly inquire of Sprouse at his deposition and again at trial of such

-14-

matters as would have substantially impacted upon Sprouse's credibility; (Discussed p. 18).

    (c) to obtain evidence or information regarding Sprouse's background which would have substantially discredited Sprouse's testimony; (Discussed p. 18).

    (d) to consult with petitioner in sufficient time to prepare a defense; (Discussed p. 17).

It should be remembered that on page 5 of the District Court's order, it is stated as follows:

> Respondent acknowledges that petitioner has exhausted all available state remedies in that he has properly presented his claims to the state courts or has otherwise procedurally defaulted his claims.

In its ruling, the U.S. District Court states as follows:

> **Certificate of Appealability**:
>
> . . . [A] COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c)(2). A substantial showing is a showing that the issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings. (Citations omitted). The Court finds that the only claim on which petitioner can make a substantial showing of a denial of his constitutional rights is the claim of ineffective assistance of counsel in ground 8(d) of his claims for relief. The Court will therefore issue a certificate of appealability as

to that ground of the petitioner only. (District Court Opinion, pp. 20-21).

Hanes, of course, is persuaded that the District Court should have certified more of his claims than 8d. When the certification order was entered, appellate counsel should have immediately moved the District Court to reconsider and add additional claims for appeal. Had that not been successful, appellate counsel should have petitioned this Court to add additional claims. It was another situation where Hanes' counsel was clearly ineffective all to Hanes' detriment. Since only one claim has been certified, I agree with the majority that the recent case of Slack v. McDaniel, 120 S. Ct. 1595, 1600 (2000), governs the right to appeal a habeas corpus petition after the effective date of AEDPA (April 24, 1996), even though Hanes' petition was clearly filed prior to the effective date of the AEDPA. The Slack case specifically holds that said right to appeal is governed by the certificate of appealability (COA) requirements now found at 28 U.S.C. § 2253(c). (1994 ed., Supp. III). This is true whether the habeas corpus petition was filed in the District Court before or after AEDPA's effective date. Id., 1600.

The Slack case does not affect the consideration of the **merits** of Hanes' appeal as it also holds that a petition filed before the AEDPA law is considered on its merits according to pre-AEDPA law.

## FUNDAMENTALLY UNFAIR
## AND/OR UNREASONABLENESS IS THE TRUE TEST

The bottom line prior to AEDPA was: Was the trial fundamentally unfair and were the acts of counsel unreasonable?

> Even if a defendant shows that particular errors of counsel were unreasonable, therefore, the defendant must show that they actually had an adverse effect on the defense . . .
>
> On the other hand, we believe that a defendant need not show that counsel's deficient conduct more likely than

-16-

not altered the outcome of the case . . . (Emphasis added).

> The defendant must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonably probability is a probability sufficient to undermine confidence in the outcome. <u>Strickland v. Washington</u>, 466 U.S. 668, 693-94 (1984).

Further, the <u>Strickland</u> Court stated:

> [F]irst the defendant must show . . . that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
>
> <u>Strickland</u>, 466 U.S. at 687; <u>Boysiewick v. Schriro</u>, 179 F.3d 616, 619 (8th Cir. 1999).

Further, this Court has held:

> [T]he focus is on "whether counsel's deficient performance renders the result of the trial unreliable <u>OR</u> the proceeding <u>fundamentally</u> <u>unfair</u>." <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 372 (1992). (Emphasis added).

<u>Mansfield v. Dormire</u>, 202 F. 3d. 1018, 1022 (2000).

The facts in the Hanes case easily show the trial was fundamentally unfair and/or unreasonable and Hanes should get a remand. Mr. G's acts and omissions were unreasonable so as to render the result of Hanes' trial unreliable. As the precedent shows, if the trial was fundamentally unfair, there should be either a

-17-

granting of the Writ or a remand to clarify and expand the record to make sure the result is reliable.

However, if because of glaring errors by Hanes' counsel we can only consider plain error, I am persuaded that there is enough ineffectiveness to demonstrate a manifest injustice. Since the certification must be governed as post-AEDPA and only paragraph 8d can be considered, I am still persuaded, when the full paragraph 8d as set out in the District Court's opinion is what is considered, that there is more than enough there to entitle Hanes to a remand.

The majority sets out in its order on page 3 and 4:

> As is always the case, we review the district court's legal conclusion as *de novo* and its factual findings for clear error. Citing Couch v. Trickey, 892 F.2d 1338, 1341 (8th Cir. 1989).

The case of Groseclose v. Bell, 130 F.3d 1161, 1163-64 (6th Cir. 1997) (citing McQueen v. Scroggy, 99 F.3d 1302, 1310 (6th Cir. 1996)), reaches the precise same conclusion but continues the discussion as follows:

> Further, federal courts must defer to state court factual findings, according a presumption of correctness that the petitioner may rebut only with clear and convincing evidence. Id.
>
> > [I]n a federal habeas corpus challenge to a state criminal judgment, a state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court to the extent stated by 28 U.S.C. § 2254(d). Ineffectiveness is not a question of "basic, primary, or historical fac[t]." Rather, . . . it is a mixed question of law and fact. Although state court findings of fact made in the course of deciding an

-18-

> ineffectiveness claim are subject to the
> deference requirement of § 2254(d), and
> although district court findings are subject to
> the clearly erroneous standard of Federal
> Rules of Civil Procedure 52(a), both the
> performance and prejudice components of
> the ineffectiveness inquiry are mixed
> questions of law and fact.  Strickland v.
> Washington, 466 U.S. 668, 698, 104 S. Ct.
> 2052, 2070, 80 L.Ed. 2d 674 (1984).
> (Citations omitted).

Groseclose v. Bell, at 1163-64 (6th Cir. 1997).

Because Hanes is a pre-AEDPA case, we must apply 2254(d) as it existed prior to enactment of the AEDPA to the merits of Hanes' claim.  Hanes' "expanded" claims of ineffectiveness should each be considered *de novo*.

Judge Beam has provided us with an enlightened view of just what the test should  be.  In Seehan v. State of Iowa, 72 F.3d 607 (8th Cir. 1995), on page 613-14, Judge Beam in his dissent states as follows:

> In considering the prejudice prong of ineffective
> assistance . . . the rulings of both this court and the United
> States Supreme Court.  [Holds that] [r]uling on deficient
> performance and prejudice require[s] courts to make a
> legal determination by applying legal standards to the
> underlying facts.

Judge Beam goes on further to discuss the matter and concludes by saying:

> Thus, whether or not the facts support a finding of
> Strickland prejudice is a question of federal law which we
> address *de novo*.

Judge Beam also sets out that the majority in the Seehan case did not contest his above-set out conclusions.  Id. at 612-14.

**AMERICAN BAR ASSOCIATION**
**DEFENSE FUNCTION STANDARDS, 4-1 - 4-8.4**

The Court is persuaded that it is reasonable to consider the matter of ineffective assistance of counsel in relation to American Bar Association Defense Function Standards discussed in Strickland, (p.688) where the Court says that "these standards are guides in determining what is reasonable (to evaluate counsel's performance), but they are only guides." Nowhere in anything this Court has seen are the duties of defense counsel set out more clearly and concisely than they are in these standards.

This Judge is persuaded from the record that trial counsel Mr. G[9] never complied with any of the standards 4-1 - 4-8.4. For brevity's sake, we will now mention some of the most damaging failures. Standard 4-1.2, defense counsel must serve as the accused's counselor and render effective, quality representation. Standard 4-1.3, defense counsel should act with reasonable diligence and promptness. Standard 4-3.1, defense counsel should establish a relationship of trust and confidence with the accused. (Under the commentary, it states as follows): "Nothing is more fundamental to the lawyer-client relationship than the establishment of trust and confidence.

Standard 4-3.2, as soon as practicable, counsel should seek and determine all relevant facts known to the accused. Standard 4-3.6, many important rights of the accused can be protected and preserved only by prompt legal action. Standard 4-3.8, defense counsel should keep the client informed of all developments and should promptly comply with reasonable requests for information.

Standard 4-4.1, defense counsel should conduct a prompt investigation including efforts to secure all information from the prosecution and law enforcement authorities. Standard 4-5.1, after counsel is fully aware of the facts and the law, he

---

[9]I have, I hope not inappropriately, designated trial counsel as Mr. G. I didn't want to use his name. The name is on almost every page, on some pages several times. It was only done for clarification and brevity.

or she should advise the accused with complete candor concerning all aspects of the case.

Hanes, in the record flatly states that Hanes wrote Mr. G a number of letters, Ex. H, which are in the record as exhibits, wherein he implored Mr. G to confer with him to accomplish the goals of these standards. Trial attorney Mr. G did <u>none</u> of these things!

The majorities' position appears to be that since Mr. G's trial strategy was to discredit Sprouse, any shortcoming of Mr. G's and Hanes' relationship that did not help in the basic discrediting of Sprouse was not important. This ignores what Hanes knew about Sprouse and what conversations they had had. Hanes swears Mr. G never asked him what he knew about Sprouse or what Sprouse said or did at the murder scene. Mr. G also admitted that he had not seen all the video tapes that had been taken of Sprouse. All of this would be information that would help to impeach Sprouse, but it wasn't used by Mr. G.

## CHRONOLOGY OF ACTS AND OMISSIONS WHICH DEMONSTRATE NOT INEFFECTIVE ASSISTANCE OF COUNSEL, BUT POOR ASSISTANCE OF COUNSEL

Hanes has never had an effective attorney represent him since the day he was arrested. In my 23 years on the District Court bench, this case is far and away the worst case of "lawyering" I have ever encountered. The record clearly demonstrates that trial counsel Mr. G gave ineffective assistance. Hanes was convicted.

Another sad episode in Mr. G's ineffectiveness was favorable information that Mr. G didn't follow up on which could have set Hanes free. Diane Brown was a psychologist with her master's degree working on her doctorate through the psychiatrist at the County Jail. She was Hanes' counsel who often visited him in the jail. Hanes testified at the post-conviction relief hearing, "At least once or twice a week, we would spend an hour to and hour and a half . . . for five months at least (before the trial). [I]t also continued **after** the trial." (Emphasis added). ". . . [T]he day before I was to be sentenced, she called me out . . . she said that she had good

-21-

news for me and the good news was that the psychologist at the Gumbo institution has been seeing Sprouse and that Sprouse had told him that I had not done the crime and that he would testify in my behalf." Hanes stated that in response to that good news, ". . . I called my mother to give her this information. She called Mr. G and told him. Mr. G did tell me at the sentencing that he had gotten the information and that he would personally go out and speak to the psychologist and would use it as work on my appeal."

There is nothing in the record to confirm that Mr. G did anything about this great news. One psychologist was telling Hanes that another psychologist had information that would clear Hanes. Mr. G blew it. To this day, nobody has talked to those two doctors.

Hanes' new appellant counsel at the post-conviction relief hearing should have immediately requested that the sentencing be delayed so that he could find Diane Brown, ascertained who had given her the information that Sprouse had cleared Hanes and get that psychologist to make a statement to the Court to be used on a motion for a new trial and/or get a new statement from Sprouse. New appellant counsel heard what Hanes said. Said counsel heard Hanes say Mr. G had ignored it, and then said new appellant counsel ignored this great lead himself.

The post-trial proceedings included Mr. G demanding $5,000.00 before he would appeal, receiving the $5,000.00, and then never appealing. (Ex. 3, 4 and 9).

The acts or omissions of Mr. G representing Hanes post-trial were so bad that the state of Missouri set aside all proceedings and five (5) years later, appointed him a new attorney and then resentenced him. (P.C. Tr. p. 334). This five-year delay made it harder to proceed with an effective appeal. However, this was a great step in the right direction as far as Hanes was concerned, but it did not last long. The new attorney "forgot" to file a motion for a new trial. The Missouri Supreme Court later ruled that since no motion for new trial had been filed, that none of Hanes' claims had been properly preserved and thereafter only considered his claims under the "plain error standard" which is much stiffer and harder to overcome. As seems to be typical of his new appellant attorneys, those attorneys filed a detailed motion

setting out why they had not filed a motion for a new trial and said that it was not necessary to file such a motion under the circumstances. The only thing wrong with their position was that the Missouri Supreme Court did not buy it. So Hanes, again, had been robbed of a fair appeal by poor lawyering. As mentioned, they filed a great brief to try to cover their mistake. But, it was not meant to be. This was a crucial blow to Hanes' appellate position.

Then came the attorney-client fiasco. This is set out in detail under a separate section entitled, "Attorney-Client Fiasco." It involves counsel for the co-defendant wanting to tell the courts, how ineffective Mr. G was, and not knowing what to do so that it would help Hanes.

Further incompetence on the part of Hanes' appellate attorneys occurred after the District Court judge limited the certification in this case to one claim, 8d, which is fully discussed in the "Certification" portion of this dissent. Appellate counsel did not request that the District Court increase the number of issues certified and then make the same request to the Circuit Court if the District Court did not do so.

Hanes' bad luck, in having ineffective lawyers and/or poor performance by his lawyers, was again with him when his counsel on this habeas corpus matter did not appear for argument before this Court. It is very true that again, the new appellate counsel had a great reason and showed this panel, in a great brief, just why he should not be held responsible. As mentioned above, his greatest briefs are those where he is trying to cover up his own mistakes. The bottom line is, did Hanes ever get a fair shake? The answer is, no. Was his trial fundamentally unfair? The answer is, absolutely yes.

### ACTS OR OMISSIONS OF MR. G
### (TRIAL ATTORNEY)

**This is a list of acts or omissions, supported by the record, that clearly demonstrate trial counsel Mr. G gave ineffective assistance.**

1. Prior to trial, Mr. G visited Hanes on only **two** occasions while Hanes was in the St. Louis County Jail for a capital murder trial. These visits occurred November 9, 1981, and then after a lapse of almost 7 months, just before the trial on June 1, 1982. The combined length of these visits was 124 minutes as shown by the records at the jail. (P.C. Tr. pp. 3-6) (Plaintiff's Ex. 8).

Trial counsel claimed he had conferred with the appellant at the Courthouse on several occasions prior to trial, including at a preliminary hearing. These claims were not true because there never was a preliminary hearing and there obviously were no pretrial hearings because there were no pretrial motions filed. The only court appearances would have been at his arraignment. Trial counsel claimed one or more of his associates had also visited appellant, but he was unable to recall which ones. The jail records do not support this, and Hanes denies this ever happened. (P.C. Tr. p. 352).

2. Appellant's mother, Virginia Hanes, testified that she had made several appointments with Mr. G to discuss her son's case but that most appointments were cancelled by Mr. G at the last minute. (P.C. Tr. p. 160). She was told by Mr. G, **"I did not think it is necessary" to consult with the Appellant.** (Emphasis added). (P.C. Tr. pp. 161-62).

Appellant and his mother made several attempts to communicate with trial counsel and sent him numerous letters, designated as exhibit "H," begging for the opportunity to consult with Mr. G. (P.C. Tr. pp. 27-32).

3. Mr. G failed to consult with Hanes about the nature of the charges, the possible defenses, pretrial strategies, and Hanes' request to have Mr. G call four (4) defense witnesses.

Mr. G failed to consult with Petitioner in sufficient time to prepare a defense. (App. 24).

4. Although Mr. G testified that he had provided a copy of the police reports to Virginia Hanes (mother) to pass on to her son. (P.C. Tr. p. 348). Hanes' mother flatly contradicted this. (P.C. Tr. p. 166). Mr. G did not give copies of the police reports or any other documents (exhibits) that were introduced at trial to Hanes.

There was no testimony at the post-conviction relief hearing from trial counsel Mr. G that he ever provided Appellant with any police reports, copies of depositions, documents, or video and tape recordings pertaining to his case and he didn't deny this omission. (P.C. Tr. pp. 22-23).

5. Mr. G failed to provide Hanes with a copy of the deposition or allow him to see the various videotapes of Sprouse, co-defendant, or even discuss them with him, so Hanes had no notice or pretrial knowledge of what Sprouse was going to say.

Mr. G either never was provided Sprouse's complete criminal record by the prosecutor or he never personally checked co-defendant Spouse's criminal record. Had he had it and used it properly, it would have devastated the credibility of the co-defendant Sprouse. (App. 33).

6. Mr. G failed to depose or interview any of the states many listed witnesses (except Sprouse) for trial including the police officers who conducted the murder investigation. (P.C. Tr. p. 79). Mr. G claimed to have made some interviews, but he could recall no names. (P.C. Tr. pp. 396, 423).

Even though the jury was to be "death qualified," trial counsel failed to file a motion for individual voir dire.

7. Mr. G failed to hire a private investigator to help prepare the case for trial.

8. Mr. G failed to file any pretrial motions including but not limited to a motion to suppress the alleged "confession" or to suppress the testimony that he was the first person to mention the term "Energine" or to disclose impeaching (Brady) information, or a motion to get copies of the co-defendant's statements and videotape, or a motion to sequester the jury, or a motion for individual voir dire. (P.C. Tr. pp. 424-25).

9. Mr. G failed to effectively depose the state's chief witness, Sprouse, neglecting to ever ask Sprouse at the trial whether Sprouse had mentioned the word "Energine" to the police at the time before the moment that the police now claim

they first heard the word "Energine" from Hanes. Hanes denies he ever said this and further states that he had never before heard the word "Energine."

10. Mr. G filed no motion to reveal the plea agreement between Sprouse and the state even though Sprouse was the state's key witness.

11. Mr. G failed to advise the Petitioner he had never tried a major criminal case in Missouri before the instant case or that he was unfamiliar with the rules and statues that govern such trials.

12. Mr. G did request a mistrial (T. Tr. pp. 560-562), but he did not request any corrective instruction to disregard or strike when the prosecutor repeatedly tried to get into evidence the fact that Hanes was plotting to kill his wife.

13. Mr. G didn't call 3 vital witnesses.

14. Mr. G also claimed to have filed a notice of appeal, but none was filed (P.C. Tr. p. 11), and no appeal was pursued despite counsel being paid $5,000.00 to do it.

What Hanes says about the $5,000.00 check and what Sprouse says are miles apart. Mr. G lied about why he demanded the $5,000.00. (P.C. Tr. pp. 11, 12, 180, 380, 384, 453). (See Ex. A, p. 6, No. 27).

15. His post-trial conduct was so egregious that the state of Missouri **conceded** that his said acts and omissions were ineffective and had him resentenced.

16. The post-conviction relief hearing Court described Mr. G's handling of the post-trial phase as **"outlandish"** and expressed surprise that trial counsel was allowed to practice law in the state of Missouri.

### ILLINOIS-MISSOURI FIASCO

The next serious shortcoming of counsel for Hanes was the Illinois-Missouri fiasco. In this habeas case, new appellate counsel for Hanes was trying to show that Mr. G was not only ineffective but that he had been suspended in both Illinois and Missouri for precisely the same kind of ineffectiveness of counsel that the record here shows he gave Hanes. Counsel for Hanes had not done his homework and did

not know the extent of Mr. G's identical ineffectiveness that he gave Hanes or just why he had been suspended as is set out in public records in both states.

The state of Missouri has an affirmative duty to want and expect a fair trial. At the hearing before this panel, this was not evident by the conduct of Appellee's counsel here. Certainly, said counsel has a duty to come before the Court and make the best argument possible; however, when asked a question about Mr. G telling lies to Hanes and his mother and stating that Mr. G had been present at a preliminary hearing in the Hanes' case and that he had spent a lot of time preparing for it, when there hadn't been any such hearing, Appellee's counsel's answer was the usual stock answer. In effect counsel said,

> These prisoners always accuse their lawyers of bad things, poor Mr. G, he had a lot of other cases, it is not surprising that he didn't not remember that there was no pretrial hearing in this case. Prisoners who commit crimes and then try years later to blame their convictions on their attorneys should not be listened to.

It is clear from the record that Mr. G had been suspended for a long time in both Illinois and Missouri for misconduct that had been going on for over 25 years. This is more fully discussed in the "Deference" portion of this dissent. His suspensions are public records, which this Court has taken judicial notice of, on many other occasions.

It should be remembered that the post-conviction relief judge, after listening to and observing Mr. G's conduct, described said conduct as "outlandish" and expressed surprise that Mr. G was allowed to practice law in the state of Missouri. (P.C. Tr. p. 451). Later, when what Mr. G had been doing was brought to the attention of both the Illinois and Missouri Supreme Courts, he didn't have a license.

Why did the post-conviction judge conclude Mr. G was outlandish? One factor would have been his bold faced lie approach. As to Mr. G being credible, I would call your attention to post-conviction relief transcript pages 449 to 457. In

that portion, Mr. G is being cross-examined by Hanes' appellate counsel as to Mr. G demanding, right after the trial was over, the sum of $5,000.00 for an appeal. Of course, as Hanes' counsel was asking these questions, everyone in the place, including Mr. G, knew that there had been no appeal. So, he said that the $5,000.00 that he took wasn't really for the appeal it was for other matters including a possible post-conviction relief and/or hearings before the parole board and/or possible commutation of the sentence by the Governor of Missouri. Then, he flatly said that the $5,000.00 was for such things as that. He was then shown Ex. 3 and 4 which were letters written by him wherein he flatly said, "I need $5,000.00 for an appeal, and I need it right now." As well as Ex. 9, the check he received for $5,000.00. Mr. G, without knowing that the cross-examiner had the exhibits setting out that he is demanding $5,000.00 for an appeal, was trying to say that he had a legitimate reason for demanding the money, and the $5,000.00 was properly paid to him. Even after he was shown these exhibits, his own letters, over his signature, he said that the money was really for getting Hanes a pardon or a commutation of sentence.

At that moment, Mr. G was being a bold-faced liar. He blatantly was trying to tell the post-conviction relief judge that he thought it was appropriate to take that $5,000.00 from Hanes' mother so that he could go to the Governor and get a commutation of sentence. The chances of doing that within a few days after a fifty year sentence has been imposed are nil as anyone would know.

The majority, in footnote 6 on page 5 of its order, begin to discuss how competent Mr. G was as counsel. They then use all of page 6, 7, and part of page 8 adopting as true all the things Mr. G claims he did as an effective counselor. They concede they must give deference. That ignores the fact that he was an awful liar as set out above and as found to be by Supreme Courts of Missouri and Illinois. That ignores the fact that Hanes and his mother emphatically deny such "effective" acts. They also try to explain that not calling Hanes' wife and Gary Seiner to testify was a proper strategy decision. These "strategic" choices by Mr. G are addressed at some length herein, and said "strategy" is shown to be stupidity because the record shows Hanes' wife should have been allowed to refute the testimony that Hanes was going

to kill her and Seiner should have been there so that the prosecutor could not pound on the table and argue that he wasn't there because he did not want to commit perjury.

On any remand, what the Illinois Supreme Court and the Missouri Supreme Court have clearly said about Hanes' trial counsel, i.e., 25 years of serious client neglect, would be most relevant to review the "approval" of Mr. G's conduct which the majority here has given it.

## "CONFESSION"
## FAILURE TO CALL WITNESSES
## BOWERSOX FIASCO

On numerous occasions, Hanes and his mother, Virginia Hanes, informed trial attorney Mr. G that both Virginia Hanes, his mother, and his wife, Alison Hanes, should be called as witnesses. Mr. G never talked to the wife, Alison Hanes, but did, prior to trial, talk briefly with Hanes' mother, Virginia.

An important piece of evidence that was used against Hanes was an alleged statement he made to his mother in a telephone conversation with her from the police station shortly after he was arrested. The police had arranged a confrontation between Hanes and co-defendant Sprouse. Hanes later was allowed to call his mother. During the conversation, the investigator, Captain Humphrey was nearby Hanes. In that conversation, Hanes advised his mother that articles of stolen property from the decedent's home were in the mother's house and that the police were coming for them. Captain Humphrey has testified that he listened to what Hanes said on the telephone and states that this is what Hanes said: "No, mom, that is not all. It is worse. Please tell Alison to bring my medication and please send my prayer book and pray for me."

The prosecutor at the trial and now the respondent contend these words clearly demonstrate that Hanes "confessed" when talking to his mother at the time of his arrest. **There was no CONFESSION!**

Hanes' trial counsel never really disputed the contentions as to a confession. As a result, the prosecutor flatly told the jury that Hanes had confessed to his mother and that his mother had not been willing to testify because she knew he was guilty and did not want to commit perjury. (T. Tr. p. 635).

Hanes' mother was at the original trial, but Mr. G told her that she would have to stay outside in case he did call her as a witness. Despite much urging by Hanes, Mr. G did not call Hanes' mother to allow her to refute the contention that their conversation did not include any "confession" by Hanes.

Hanes' mother's recollection of the conversation with Hanes differs substantially from that of Captain Humphrey. She testified that in that call, Hanes said to her, "Will you please bring my medicine or have Alison bring my medicine and my prayer book to the County Jail," and I said, "Yes." Then I asked Bill, I said, "Is that all?" And Bill says, "Oh Mom, Mom," and he says, "They're accusing me." (P.C. Tr. p. 169).

During the closing argument of the guilt phase of Hanes' trial, the prosecutor, on 14 separate occasions, characterized Captain Humphrey's version of this conversation as a "confession" made by Hanes to his mother and made pointed references to it as a statement of a guilty man.

> And he (Hanes) could never explain away that statement
> that he made to his mother, the statement he made to his
> mother on the telephone, the statement of a guilty man,
> "No, its worse than that. Bring my prayer book and pray
> for me." It's not saying, "I have been falsely charged. I
> didn't do it. I didn't do it." To his own mother he's
> saying, "Bring my prayer book." If it's your own mother
> you would say, "I didn't do it. I didn't do it." His own
> mother isn't here to testify to that. (T. Tr. p. 635).

At the trial, Hanes did testify and did dispute the contention that he had made any kind of confession to his mother. At that time, he again reminded Mr. G that Hanes' mother was out in the hall waiting to be called to refute any claimed

confession. Mr. G never did call Hanes' mother. The prosecutor emphasized and exploited this alleged failure of the mother to deny the "confession" as set out above.

Years later at the post-conviction relief hearing, the mother, Virginia Hanes, did testify that trial attorney Mr. G never would discuss with her the State's contention that her son had confessed to her over the telephone. (P.C. Tr. p. 168).

Hanes' mother testified she was unaware that the prosecutor was attempting to characterize the telephone conversation as a confession until her husband told her about it during the trial. It should be noted that her husband was inside listening to the trial, but she was outside as a possible witness.

Hanes' mother testified at the post-conviction relief hearing that after she heard of the prosecutions' version of the telephone conversation with her son, she "almost begged" Mr. G to let her testify. Hanes' mother testified that while she was sitting out in the hall during the trial, "a policeman came up to me and said your son did not confess." (P.C. Tr. p. 191).

There is no doubt that Hanes' mother was available and very willing to testify. It is also beyond doubt that Mr. G knew she was outside because he had sent her out there. Not to call the mother as a witness was not any strategic move on behalf of trial counsel. This was out and out stupidity. It led the jury to conclude that Hanes' mother was not testifying because she would have to admit that he had "confessed" to her during the telephone conversation. There is no conceivable, strategic advantage in not calling Hanes' mother. What possible scenario could there be that would be more damaging to Hanes' case than the one left, when the prosecutor looked right at the jury, and told them that Hanes' own mother would not come before them because she can't refute this confession. Hanes had made it clear to Mr. G that his mother could rebut the allegations of Captain Humphrey that he (Hanes) confessed to his mother. Mr. G never called Hanes' mother to the stand. Nor did Mr. G make any attempt to suppress the confession testimony.

As devastating as Mr. G's refusal to counteract the prosecutions' version of the "confession" as set out above, was the fact that the prosecutor repeatedly sought, in front of the jury, to introduce evidence that Hanes planned to kill his wife, Alison Hanes, in order to obtain her life insurance proceeds. (T. Tr. pp, 292-94, 504-05, 559-63). The jury heard these accusations even though the objections to some of it were sustained.

Sprouse flatly said that he feared Hanes because Hanes told Sprouse that he (Hanes) wanted to kill his in-laws and his wife. (T. Tr. p. 292, *ll*. 4-5). Hanes' trial counsel **NEVER** even **tried** to meet with Hanes and his wife to refute this devastating claim. It was not true! It could have been easily refuted by calling his wife as a witness.

I respectfully submit that the majority opinion is in error when it concludes on page 8 as follows, "The testimony of Alison Hanes was unnecessary as allegations that Hanes plotted to kill her for insurance money never reached the jury. See T. Tr. pp. 292-94."

**It is true that on line 14 of page 292** the record shows that, "the following proceedings were had at the bench." However, if you look on the same page 292, starting at line 2 through 5, it sets out:

> Q:    What, if anything, else did you fear from Hanes,
>         that made you afraid of him:
>
> A:    He was telling me of plans that he wanted to kill his
>         in-laws, and his wife. **(THE JURY HEARD
>         THIS).**

The jury heard the above just a few seconds **before** they went to the side bar.

The next time this matter shows up in the record is at page 504, line 9, where it states: (The following proceedings were had at the bench:) The record then states: (by defense counsel),

> . . . He's attempting to get in through this witness some
> allegation of an idea to injury or harm this man's wife.

The Court made that ruling before . . . He knows what response he wants. He's gone over this with this woman. And the Court made its ruling. And I think he's intentionally doing it. (T. Tr. p. 504, *ll*. 13-19).

Then the prosecutor admits that he is trying to do this when he says:

> MR. GOLDMAN: My point is, **Mr. Sprouse testified that one of the reasons he was afraid of Mr. Hanes was that he threatened to kill his wife.** [T. Tr. p. 292]. Mr. Hanes made some statement to this woman, saying he could solve financial problems by getting rid of his wife because he had an insurance policy. At least I would like her to say his wife had an insurance policy.
>
> Mr. Sprouse was allowed to say this was why he was afraid of Hanes. (T. Tr. pp. 504-05, *ll*. 23-5). (Emphasis added).

When Goldman said Sprouse had already said it, i.e., about killing his wife, he was referring to the testimony on page 292 of the trial transcript.

The prosecution's compulsion to again get in front of the jury Hanes' wanting to kill his wife is set out in the trial transcript on page 559, line 11-13:

> Q: Well, didn't you tell the employees there that you were in desperate financial trouble, and that you were thinking of declaring bankruptcy?

The prosecutor does it again on page 559, line 25 of the trial transcript where he says, "You talked about your wife being -"[.] Hanes' counsel interrupted and objected when he said:

> MR. G: He's attempting to bring in some relationship between this man and his wife. (T. Tr. p. 560, *ll*. 3-4). **(THE JURY HEARD THIS)**.

He does it again:

-33-

Q:    Did you not tell Sprouse that you wife was the source of your financial trouble, because of all her spending, and you were mad about it?

A:    I think that I mentioned - - I can't give a definite yes or no.  I think so, sir.

Q:    Did you not tell Sprouse there were people that you wanted to have eliminated?  (**THE JURY HEARD THIS**).

A:    No, sir.  (T. Tr. p. 560, *ll*. 12-19).

I am aware that at this one time, the Court told the jury to disregard the questions set out above, but the very next question on page 560-61 of the trial transcript at line 25-26, the prosecutor does it again:

Q:    Did you have any of these conversations with the employees at Barnes Hospital?

A:    About what, sir?

Q:    About your wife being the source of your financial trouble, and about her insurance policy.  **(THE JURY HEARD THIS**).

MR. G:    I am going to object.  May we approach the bench, please?

Without setting out the exact transcript, at the side bar Hanes' counsel moved for a mistrial telling the judge that it was at least five times that the prosecutor had gone into this matter and a supposed insurance policy on his wife.  The prosecutor argued that it was relevant.  The Court overruled the motion for a mistrial saying at page 562, line 1-2 of the trial transcript:  "I am going to overrule your motion for a mistrial at this time."

A short time later, the prosecutor goes back into it and says:  "Did you tell Sprouse and the employees where you worked about your wife's insurance?"  (T. Tr. p. 563, *ll*. 21-22).  (**THE JURY HEARD THIS**).  Counsel objected, and the Court sustained it.

-34-

This subject is also in the record during the closing arguments, where the prosecutor stated: ". . . He [Hanes] talked about financial trouble, his wife spending too much. He had a need and a reason for money." (T. Tr. p. 630, *ll.* 18-20). (**THE JURY HEARD THIS**).

As mentioned, the matter of threatening to kill his wife for money was brought to the jury's attention four or five times as set out above. The prosecutor admitted he was repeatedly coming back to it even though the judge sustained most of the objections. These rulings didn't erase what the jury had heard, and the judge did not tell them to disregard it. In only one of these instances did the ineffective counsel ask the Court to tell the jury to disregard the statement or answer.

The majority in footnote 8, page 8, discusses this situation and concludes that "these instances do not amount to the trial court's having allowed evidence of a plot by Hanes to kill his wife for insurance money to come before the jury, as suggested by the dissent." The test should not be, did the trial court allow it. The test should be, did it get before the jury? (Yes). Was it intentional? (Yes). Was it fundamentally fair? (Strickland, at p. 697). (No). Did it affect the trial? (Yes).

Mr. G either was or should have been well aware in advance of the trial that the State, through co-defendant Sprouse, was going to try to introduce the evidence that Hanes had planned to kill his wife. There should have been a motion to suppress. When this all shook down, Hanes pleaded with Mr. G to call his wife to the stand so that she could refute the testimony and flatly say that there was no insurance policy on her life. (P.C. Tr. pp. 58-9). Hanes' wife was willing and anxious to testify on Hanes' behalf. (P.C. Tr. pp. 305, 308, 412). It is clear, now, that if she had been called, she would have testified that there was no insurance policy on her life, no trust which would allow funds to come to Hanes if she died, that she knew the Hanes was aware of this, and that Hanes was also aware that he would inherit nothing from her upon her death, and there was no possible financial gain to Hanes if she died, as Sprouse had incorrectly told the jury. (T. Tr. pp. 310-316, 504-05).

In a nutshell, Hanes was on trial. Sprouse, his co-defendant, was putting all the blame on Hanes. Captain Humphrey was telling the jury that Hanes made a "confession." The jury has heard on four or five occasions that Hanes wanted to kill his wife for money. This Court can conceive of no scenario that would allow Mr. G to conclude that he could not put Hanes' wife on to dispute these devastating accusations because there is something else that she might have to say which would hurt Hanes worse before the jury, than he already was hurt, by the fact that the jury was going to deliberate knowing that Hanes was a man that was so desperate for money that he was planning to kill his wife for money. There is no way Mr. G could contend or any court could decide that this stupidity should be forgiven because it was a lawyer's strategic decision.

The Respondent's Brief on page 15 sets out how the Respondent argued this situation to the court.

> The Petitioner's claim that counsel was ineffective for failing to contact certain witnesses is equally unavailing. Petitioner asserts that counsel was ineffective for failing to contact his mother, Virginia Hanes; his wife, Alison Hanes; Gary Smith; and, Gary Seiner. . . . Decisions regarding witnesses' selection is within the discretion of trial counsel, and his judgment will not be seconded guessed by hindsight. Citing, Walls v. Bowersox, 151 F.3d 827, 834 (8th Cir. 1998).

A review of the Bowersox case cited above is very revealing. In Bowersox, the Court stated:

> [T]he defense team made an extensive effort to investigate Walls's family background and to secure the family's testimony at trial. Walls identified sixteen potential witnesses for the penalty phase [and his attorneys made every effort to make contact.] [These people were reluctant to testify.] The second-chair attorney also talked

to Walls's mother, father, and step-mother several times. [And] [f]inally, lead counsel himself spoke with Walls's mother . . . In all [of their other] contacts with the defense team, the family steadfastly refused even to attend the trial, much less to testify. (Emphasis added). . . . [The Court stated that] [a]lthough counsel was unable to procure the testimony of the family members, we cannot say it was from a lack of effort. . . . "Decisions relating to witness selection are normally left to counsel's judgment, and this judgment will not be second guessed by hindsight." (Citations omitted). (Emphasis added).

The Court then said: "The value of this unoffered testimony must be substantial to prove prejudice." Stokes v. Armontrout, 851 F.2d 1085, 1095 (8th Cir. 1988). Walls v. Bowersox, 151 F.3d 827, 834 (8th Cir. 1998).

It is easy to see that the Bowersox's facts were miles away from the Hanes' facts where Hanes' wife and mother were ready, willing and able to testify. The Respondent's reliance on Bowersox as its sole support for the proposition that witnesses selection is within the discretion of trial counsel and his judgment will not (the word "normally" is omitted here) be seconded guessed by hindsight, is easily distinguished from the facts now before us. There was no legitimate trial strategy here as to witness selection.

On pages 19 and 20 of the District Court's ruling denying the writ, the judge adopted the Respondent's Brief on Bowersox word for word when the judge said: "Decisions regarding witness selection is within the discretion of trial counsel and his judgment will not be second guessed by hindsight." In its Brief, the Respondent had left out the all important word normally, so did the District Court as set out above. Hanes' case is not the normal case.

On page 7 and 8 of the majorities' ruling, they discuss the fact that Hanes alleges that Mr. G failed to contact witnesses necessary to the defense and refute said claim by citing as controlling law, Williams v. Armontrout, 912 F.2d 924, 933

(8th Cir. 1990). In reading <u>Williams v. Armontrout</u>, the facts show that one Haslet told Williams he was drunk at the time of the crime and did not remember anything. Another witness, Days, states that he was unsure of the situation and that he could not provide any information that would really help Williams. This <u>Williams v. Armontrout</u> case, can hardly be a precedent for Hanes. Its facts are as far removed from the Hanes case as the <u>Bowersox</u> case fully discussed above. It is clear in Hanes that all three of these people, Hanes' mother, Hanes' wife, and Seiner wanted to testify and did have some important things that they could have said. It is actually sad that the mother, the wife, and Seiner did not testify at the trial.

Based on the foregoing, there is just no strategy that would support Mr. G's stupid choices. They do not fall within the range of reasonable representation. Hanes, therefore, has established the first prong of the <u>Strickland</u> standard and Hanes can show prejudice.

> We do not set aside a conviction or sentence solely because the outcome would have been different but for counsel's error, rather, the focus is on whether "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L.Ed.2d 180 (1993).

Further,

> A claim for ineffective assistance of counsel can prevail only if a defendant demonstrates both deficient performance on counsel's part and resulting prejudice. <u>Strickland v. Washington</u>. (Citation omitted). Counsel's performance is deficient only if it is shown that he or she "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," <u>id</u>., and prejudice is shown only where

"there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694. Grieman v. Thalacker, 181 F.3d 970, 972 (8th Cir. 1999).

It does not take a rocket scientist to know that when the jury went to deliberate that they thought both his mother and his wife were in a position where they could not come and testify because the truth from them would kill Hanes' chances of acquittal. This Judge cannot conceive of any other more damaging conclusions to let the jury take to their deliberations. Mr. G's choices not to present this strong testimony is enough to prove prejudice.

The above discussion, of course, does not cover another glaring error in the conduct of Mr. G's representation of Hanes. In addition, there was no motion to suppress, nor a motion in limine to keep out the testimony that Hanes had once told him that he wanted to kill his wife. This certainly is not evidence that would automatically come in. It is not this Judge's duty at this time to attempt to decide how a motion to suppress or a motion in limine in relation to that damaging evidence would have shaken down; however, it is clear that it took additional stupidity by Mr. G not to have tried hard to keep out such testimony, especially in light of Sprouse's attorney's opinion made at the post-conviction relief hearing that Sprouse was doing everything he could think of to say anything he could about Hanes, as tough as it might be, to satisfy his (Sprouse's) "need" to testify against people.

Gary Seiner, had he been called, would have been able to easily refute a statement by Sprouse that Hanes was going to Chicago, after the murder, and sell the loot. Seiner was a friend of Hanes, and they had in fact talked about Hanes going to Chicago, not for the purpose of splitting up any loot but to see each other. This was a situation that the prosecutor used to his advantage because Hanes had denied that he was going to Chicago to sell the loot as Sprouse contended. Having Seiner testify would have shown the real reason for previous trips to Chicago. It would have been easy to call Seiner as a witness and show that another contention by Sprouse, that Hanes was to go to Chicago to sell the loot, was wrong.

The prosecutor, in his closing argument, tells the jury that Hanes is a liar when he claimed he had a friend he was going to go see in Chicago. The prosecutor says, ". . . It's interesting, where is the friend? Where is this friend at? I guess he didn't want to perjure himself." Mr. G. replies, "I object to that last comment." The Court states, "It will be sustained." Mr. G says, "I ask that the jury be told to disregard it." The Court states, "I have ruled on it." Mr. Goldman says, "You know his friend wasn't here to testify in court. We don't know who he is. But it's much more consistent with Sprouse saying he was calling up and making plans to sell this stuff in Chicago, and they could meet in Minneapolis and dispose of it in Chicago." (T. Tr. p. 631, *ll.* 8-20).

The majority on pages 8 and 9 state that it was not a central issue of the trial that Seiner wasn't called as a witness, but the majority obviously wasn't then considering how the prosecutor used that failure to testify as set out above.

Seiner was not put on the stand and asked questions about the above set-out situations because Mr. G didn't call him, allowing the jury to easily conclude that Hanes was a liar, as the prosecutor said he was, which further supports the conclusion that Hanes has shown prejudice to his case when Mr. G did not call these witnesses.

There is no way that such decisions by Mr. G could be considered sound trial strategy or that Mr. G acted reasonably. Counsel's deficient performance renders the result of the trial unreliable and the proceeding to be fundamentally unfair.

## ATTORNEY-CLIENT FIASCO

Defendant Hanes' co-defendant was Sprouse. Sprouse pled guilty and testified against Hanes. Mr. Hanes was represented by Mr. G. Mr. Sprouse was represented by a public defender. Defendant Hanes was convicted.

Sometime after the trial, Sprouse's attorney informed Mr. G that there was information about her client Sprouse that Mr. G should have known and should have used against Sprouse on cross-examination when Sprouse testified that Hanes was the main perpetrator in the murder.

He, for all intense and purpose, abandoned the case after the trial but not before he accepted $5,000.00 cash to represent Hanes on appeal. It wasn't until about six (6) years later at the post-conviction relief hearing for Hanes that Sprouse's counsel was a witness.

It should be noted that once again, Defendant Hanes was poorly represented. A partner of new appellant counsel for Hanes, not appointed counsel, showed up for the taking of the testimony. Sprouse's attorney said right off the bat that she had only been given partial information of what she was expected to talk about shortly before the hearing and that she had not had time to fully read it before her testimony started. As her testimony proceeded, it became very clear that if she only had her own public defender file she would be a much better witness.

She did testify that she represented Sprouse and that she was at Hanes' trial only during the time that Sprouse was in the courtroom testifying against Hanes. She was asked about Captain Humphrey of the Clayton Police Department. She volunteered, when she heard Captain Humphrey's name, that he was the one that was very much in favor of Sprouse receiving a negotiated plea. Humphrey made it clear that her client, Sprouse, should receive a negotiated plea and get a break if he would testify against Hanes. Humphrey was "very much in favor of Sprouse receiving a good deal." She recalls that she had a conversation with Mr. G, Hanes' trial attorney, telling him that he could have found out quite a bit about Sprouse that would have aided in attacking Sprouse's credibility but that he hadn't done it. She told Mr. G that he had not "sufficiently impeached" Sprouse.

> Q: Are you testifying that it was words to the effect of a statement to Rick that there was something Mr. G could have done to impeach Sprouse but didn't?
>
> A: Yes.
>
> Q: You simply made a reference to that fact that it could have happened, but you didn't share that information with him?

A:    He asked me to share it with him, but I refused to.

She testified that she did not remember the specific words she used when talking to Mr. G.  She was then asked the following:

Q:    Do you remember words to that effect, any good
      lawyer, any decent lawyer, anybody worth half his
      salt, anything of that type?

Her answer was:

A:    It's possible that might have been a statement that I
      made to him.

Q:    That there was something that (name omitted) could
      have or should have done that nay good lawyer
      would have or should have done?

A:    Yes.

She is then asked point blank what she was thinking about telling Mr. G.  She stated that she did not feel she was at liberty to discuss that based upon the attorney-client privilege.  Hanes' appellant counsel, to his credit, then argues to the Court that there is no longer an attorney-client relationship between Sprouse's attorney and Sprouse, that the privilege died with Sprouse.  **This argument, of course, missed the point.  He should have been arguing that Sprouse's counsel's opinion of Mr. G's effectiveness, or lack thereof, is not covered by the attorney-client privilege.**

The witness, in response, said:

      I do not think I am at liberty to say anything, Judge, even
      though he's dead.  [I]t's the client's privilege, not mine.  I
      can't waive it.

There was then a discussion between the judge and Hanes' appellate counsel who argued that it clearly was not an attorney-client privilege because it was not something that was said by Sprouse.  Part of what she was talking about was Sprouse's public record (rap sheet) that she had received from the prosecutor and not from Sprouse.  There is a discussion of the legal problems involved, and the

only case that is cited is, <u>Walton v. Van Camp</u>, 283 S.W.2d 493 (S. Ct. Mo. 1955). This is a case involving a Will contest case that will not solve any of the issues here.

It boils down to the fact that none of them really knew any controlling law concerning the problem involved which was, can Sprouse's attorney testify why she concluded that Mr. G was very ineffective and that because of that, the trial was not fair?

Sprouse's attorney is then asked if it is her personal belief and observation that trial attorney Mr. G should have investigated Sprouse's background, and she answered: "Yes, that's my personal opinion."

Sprouse's attorney then stated there was a difference between "investigation" and "cross-examination." She further stated that she does not know whether or not Mr. G did a proper investigation, but she assumes that his cross-examination of Sprouse would have been more effective if he knew more about Sprouse. She is then asked whether or not she has an opinion as to whether or not Mr. G should have discovered this information. She replied: "Yes. I do have an opinion, and my opinion is yes, he should have discovered it."

The sad part of this appearance by Sprouse's attorney was that both she and Hanes' appellate attorney and the Court assumed that information that they were trying to get from her was in fact covered by attorney-client privilege. The bottom line is this, why would co-defendant Sprouse's attorney's opinion of whether or not Hanes' trial attorney did a bad job of trying to impeach Sprouse, be a privilege problem? This is <u>not</u> a privilege problem! It involves failure to impeach Sprouse by either not knowing of Sprouse's bad record or by knowing about it and not using it. The prosecutor knew the extent of Sprouse's bad record and had given that information to Sprouse's attorney, who was very surprised that Mr. G had not used that information effectively against Sprouse, on cross-examination. What she knew about Sprouse's criminal record she had gotten from the prosecutor, and that certainly was not a privileged communication. Sprouse's attorney is saying that trial attorney Mr. G should have persuaded the judge that he was entitled to know all about what the prosecutor knew about Sprouse and that Mr. G did not take the

-43-

right steps to get to the right information so that he could effectively impeach Sprouse.

Sprouse's attorney then testified that Sprouse was really enjoying testifying harshly about Hanes and was actually thriving in it, and adding to it, making, in her opinion, his testimony less credible all the time.

The bottom line was that the District Court decided against Hanes being allowed to know what Sprouse's counsel's opinion was as to Mr. G's trial short comings were. These were things that were obvious to Sprouse's counsel who was about as close to the case as anyone. She had concluded that she should tell someone that Mr. G's trial representation had prevented Hanes from getting a fair trial.

The law on attorney-client privilege is very clear, and the scope of the privilege is very limited. In the case of: In the Matter of Elaine B. Fischel, Contemner-Appellant United States of America, Plaintiff, v. Harry Margolis, et al., defendants, 557 F.2d 209 (9th Cir. 1977), there is a revealing discussion regarding attorney-client privilege. The court begins with a statement:

> We begin with the formulation of the essential elements of the privilege found in 8 Wigmore Evidence, Section 2292 at 554. (McNaughton rev. 1961). (1) where legal advice of any kind is sought; (2) from a professional legal advisor in his capacity as such; (3) the communications relating to that purpose; (4) made in confidence; (5) by the client; (6) are at his instance permanently protected; (7) from disclosure by himself or by the legal adviser; (8) unless the protection be waived. Id. at 211.
>
> Other circuits have relied on this formulation. Id. citing, Bouschor v. United States, 316 F.2d 451 (8th Cir. 1963).

> **It is important to note that the privilege as
> defined in Wigmore is limited to "communications . . .
> made in confidence . . . by the client."  The privilege is
> so limited for a reason.**  The rationale for the rule is to
> encourage clients to confide fully in their attorneys
> without fear of future disclosure of such confidences.
> This in turn will enable attorneys to render more complete
> and competent legal advise.  Id.  (Emphasis added).

In the case, In Re:  Grand Jury Proceedings, (85 MISC. 140) Appellant, 791 F.2d
663, 665 (8th Cir. 1986), this Court strongly adopted the above-position.

The majority in its opinion on page 4, footnote 5, discusses the sealed
transcript of Sprouse's counsel.  They state:

> We reviewed the transcript.  Having done so, we are
> convinced that the privilege should remain in force and the
> transcript remain sealed.

The above statement repeats the error and misunderstanding of attorney-client
privilege law which Sprouse's counsel, the post-conviction relief court, and the
District Court all mistakenly considered.  The law on attorney-client privilege is set
out above and it clearly shows that the privilege is a very narrow one and extends
only to confidential communications from a client to his or her attorney.  Hanes is
not looking for any such confidential communications.  He only wants an
opportunity to depose Sprouse's attorney about matters that she saw and observed
while watching the cross-examination of Sprouse at the trial so that her opinion as to
how ineffective Mr. G was will be evidence the reviewing court can consider it.
The lower courts have blocked this legitimate evidence and now in footnote 5, the
majority has made the same mistake.  There is really nothing that Sprouse's attorney
said in the sealed deposition that is covered under the privilege as she herself
observed a much stricter standard as to what she could say than the law set out
herein would permit her to say.  It is what she could say about Mr. G in a new

-45-

"deposition" where the then reviewing court knew that the scope of the attorney-client privilege is very limited.

When this cause came to the United States District Court, eight (8) years later, there was a motion to take the deposition of Sprouse's attorney and, it was taken.

Again in Federal Court, there is little pertinent law presented to the court, and nobody recognizes that this is not really an attorney-client matter. It becomes more of a Brady violation and involves information that Mr. G should have had at the time of trial.

As mentioned, this is a sealed "deposition," and the District Court has ruled that it would not become unsealed, and the majority in its opinion here has approved that ruling. So, technically, it is not part of the record before this Court. As mentioned, Sprouse's attorney really didn't say much in the "sealed" deposition, it is what she could say if the correct law was used. I am persuaded that based on the fact that everybody has been assuming that to "open" it would be a violation of Sprouse's attorney's client-privilege, the whole matter has been misconstrued. My conclusion after reading this sealed "deposition" is that there are very important matters, only mentioned, and not discussed therein, which would and should help Hanes in this habeas corpus action.

Poor Mr. Hanes. Again, incompetent counsel did not prepare for the "sealed" deposition. Sprouse's attorney should have had her old public defender's file well ahead of time so that she could better recall the things that pushed her, out of fairness, into approaching Mr. G some thirteen (13) years before.

The District Court, in a ruling filed after Judge Gunn's sealed "deposition," states that the "deposition" shall not be opened.

I am persuaded it would be appropriate to depose Sprouse's counsel after she has had adequate time to get her own file and throughly review it. What she would then be allowed to say would go the heart of this ineffective assistance claim.

Mr. Sprouse was the star witness. He gave a detailed scenario of how Hanes was the real perpetrator of the murder. He was never adequately cross-examined.

His credibility was never really tested, and what Sprouse's counsel observed about him is **not** something that he told her. That is not a basic attorney-client matter. She mistakenly thinks it is, and none of the lawyers or judges have adequately challenged that conclusion.

The U.S. Code at 28 U.S.C. §2254(d) states in pertinent part, "an application for a writ shall not be granted... unless the adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.

The Missouri State Court, the U.S. District Court and the majority here have totally ignored the law on the scope of attorney client privilege as set out in Hickman v. Taylor, 329 U.S. 495, 508 (1947), which holds that the attorney client privilege is limited to "communications... made in confidence... by the client" and does not include an attorney's mental impressions, conclusions, opinions or legal theories. Id. at 508.

This decision by the lower courts and adopted by the majority is contrary to the clearly established federal law as set out in the Hickman case.

Sprouse's counsel couldn't stomach the result and she had to tell somebody. How can the majority say there is no ineffective assistance of counsel when the closest person to the situation, Sprouse's counsel, hasn't been allowed to tell the courts, who are relying on bad law, just how ineffective Mr. G was?

This Court should allow Sprouse's attorney to be interviewed by either competent attorneys or again by a judge if that seems to be appropriate. Certainly, the record, as it stands now, where she has to keep saying, "I cannot really recall," or, "I wish I had my file," is not something that should be ignored before this Court would rule that there is no merit to Hanes' petition for a writ of habeas corpus. This case should be remanded to the U.S. District Court if only to get accurate information pertinent to this case from Sprouse's counsel.

## ENERGINE

Captain Humphrey from the St. Louis police department was the moving force behind the charges against Sprouse and Hanes. Humphrey is the same person who conjured up the alleged "confession" by Hanes which the majority here has called "an ambiguous statement that the State argued was tantamount to a confession." The "confession" was not really a "confession," not legally or factually; but, it was given great credence by the prosecutor who hit the jury with it hard. The majority gives the impression the phoney "confession" was a minor side issue, obviously debatable, but a review of the closing arguments of the prosecutor shows that the prosecutor pounded on the alleged "confession" 14

different times. For example, the prosecutor told the jury, "Hanes confessed to his mother and she isn't here to refute that." (T. Tr. p. 635).

Humphrey went to Minnesota, talked to Sprouse, got Sprouse's story that Hanes was the new real culprit. Humphrey took at least three admission statements from Sprouse including video tapes. Humphrey is the relator of the story that in his presence, and in Sprouse's presence, with Patrolman Trautwein also present Hanes is supposed to have said that, "I am the one that injected him [the deceased], I used Energine." Hanes emphatically denies that he said this. Although there were several police reports in evidence made by Humphrey and his assistants, this "police testimony" was never set out in any police report. These police officers, who were very proficient at getting confessions and video tapes of Sprouse confessing, then say, "we didn't get Hanes to write down his confession because Hanes broke down crying." (T. Tr. p. 671). Come on! What kind of a reason is that? Is it as phoney as his "ambiguous" confession to his mother?

The Missouri Appeal court's ruling, the District Court's ruling, and the opinion of the majority give this Energine issue great weight as to why Hanes should not be granted any relief. A few things should be remembered about Detective Humphrey. Before the trial, attorney Mr. G told Hanes that Humphrey was his ex-

brother-in-law, that Humphrey had a vendetta of some sort against Mr. G. (T. Tr. pp. 102-03). It should further be remembered that the attorney for Sprouse, said that Captain Humphrey aggressively approached her about getting Sprouse to agree to a plea agreement and to testify against Hanes. She used the words, he was persistent about it, he wanted to give Sprouse a good deal. (P.C. Tr. pp. 224-25). It should further be remembered that Hanes' mother, while on stand at the post-conviction relief proceedings said that she had had a conversation with Captain Humphrey and that he had been forceful with her and told her not to challenge the contention he had made that Hanes had confessed to her over the telephone and he flatly told her, "I advise you to cooperate or else." (P.C. Tr. pp. 167-171). Hanes' mother testified that Captain Humphrey told several untruths about her conversations with Hanes. (P.C. Tr. pp. 181-82, 185). Of course, Hanes' mother specifically denies that Hanes in anyway confessed to her when he (Hanes) was allowed to call her after he had been brought into a room and confronted by Sprouse and Humphrey. They proceeded to tell him (Hanes) that Sprouse had told the truth and had confessed to his, not so substantial part of the murder, by telling them that he, Hanes, was the real instigator and the person who had the idea to kill the deceased and the one who had jumped on the deceased and stabbed him repeatedly injecting Energine.

Hanes' mother testified that during the original trial when she was out in the hall waiting to testify, a policeman came up to her and said, "Your son did not confess." (P.C. Tr. p. 191). These facts certainly cast some doubt as to just how Captain Humphrey operates both as to a "confession" and as to "Energine." Not enough doubt for a reversal; but, with Hanes' mother, his wife, Seiner, and Sprouse's counsel (after a full re-evaluation of what she knows about Sprouse and Humphrey), all testifying, the Energine issue would be far cry from the "cannot be rebutted" aura that the majority now has given it. This Court should not be deciding his guilt or innocence, but the question: Was the result of the trial unreliable or the proceeding fundamentally unfair?

If the majority recognize that Captain Humphrey's conjuring up a "confession" resulted into an "ambiguous statement that the State argued was tantamount to a confession," (majority ruling, page 7), how does the same Captain Humphrey, together with Officer Trautwein who just followed the Captain around, become the "police testimony" (majority page 3) that became the key evidence here. The majority conclude this key evidence is so strong that even if Mr. G was ineffective, this Energine testimony should carry the day. (Majority p. 10). This evidence was certainly not uncontradicted. Hanes emphatically denied it many times testifying, "I never told any policeman I injected Mr. Barlow. I never used the word Energine to an officer." (T. Tr. pp. 541-42). (Emphasis added). "I never did say Energine in that room." (T. Tr. p. 570). "Sprouse first mentioned Energine." (T. Tr. p. 580). "When Sprouse first mentioned it, he said Oragine not Energine." (T. Tr. p. 583). There are many more denials, too numerous to list.

If Captain Humphrey is a solid policeman and an honest one, then the word Energine is tough evidence as he ties it to Hanes. However, if he engages in conjuring up "debatable, tantamount confessions, which he did, should the whole case here rest on him as a solid rock? Its really a jury question. It can't be concluded that the jury already decided it because the jury didn't hear Hanes' mother or his wife or Seiner, and the jury was "tainted" as to learning the whole truth by all the trial shortcomings, set out herein, by a novice, incompetent defense attorney who made a lot of mistakes.

The majority use, on page 10, a quote from the prosecutor trying to give credence to their claim that Hanes blurted out "Energine" and saved the day. What the prosecutor says, of course, is not evidence. He only knows what the police and Sprouse told him. The statement mentions the Medical Examiner's office. Those folks, of course, only know what the police told them. Sprouse has no credibility. He testified, "I am many persons." Plus there is the unanswered question of whether or not he confessed to his psychiatrist that he framed Hanes. Officer Blaylock is hardly mentioned in the trial. Therefore, the "strong evidence" from the

"police" really boils down to Captain Humphrey. His shortcomings have been discussed above.

The "Energine" issue should not carry the day. It should be part of the remand.

## BRADY v. MARYLAND ISSUE

Co-defendant Sprouse's former attorney in her incomplete testimony at the post-conviction relief trial and in the "sealed deposition" made it clear that she was aware, from the prosecution, and from investigators that flew into St. Louis to interview her client, Sprouse, that Sprouse had a lengthy background of criminal violations. Although she says that she cannot talk specifically about what she knows due to her claim of attorney-client privilege, she does set out that in the visits with the out-of-state investigators mentioned above, she had learned a great deal about her client Sprouse. Said counsel says that she does not know for sure whether the prosecutor gave the same information to Mr. G, the attorney for Hanes, but she said that there was a great deal of information, that she had not learned from Sprouse, about Sprouse, which would have made the cross-examination of Sprouse much more effective if it had been used. Mr. G, Hanes' trial attorney, states flatly that he did not get any such information from the prosecutor and that he was pretty much in the dark as to Sprouse's background.

Brady v. Maryland, 373 U.S. 83 (1963), holds as follows:

> We now hold that the suppression by the prosecution of
> evidence favorable to an accused upon request violates
> due process where the evidence is material either to guilt
> or to punishment, irrespective of the good faith or bad
> faith of the prosecution.

Id. at 87.

In the recent case of, United States of America v. Euka Wadlington, 2000 WL 1760565 (8th Cir. (Iowa) 2000), this Court strongly supports and clarifies Brady.

The records clearly show that counsel for Hanes did urge a violation of the Brady case. Page 1 of the District Court's order allowing a "deposition" of Sprouse's counsel. (09-02-97). And, although the District Court did not certify a Brady violation, the court is persuaded that on remand, the hearing court should very appropriately revisit this issue after a new deposition of Sprouse's counsel which would be new evidence, not before known to Hanes or his counsel, and then fully consider this Brady claim.

As this Court said in, White v. Helling, 194 F.3d 937 (8th Cir. 1999):

On reflection, it is our view that the newly discovered evidence would have made a difference, and that the difference is great enough to meet the Brady materiality standard, that is, great enough to show a reasonable probability--not merely a possibility--that the result of this case would have been different.

Id. at 946.

## DEFERENCE

The basic difference between the majority and I is that by "deference," they buy all of Mr. G's statements as to the many "correct" things he did. All as set out in the majorities' opinion on pages 4, 5, 6, 7, 8, and 9.

Usually, deference is appropriate. But, deference is not appropriate when the trial court and the post-conviction relief court were grossly misinformed as to just how ineffective Mr. G was. Several of his clients brought to the attention of the Illinois Supreme Court that he was treating them in the very same ineffective manner that Hanes swears he was treated.

The Attorney Registration and Disciplinary Commission in pertinent part, made the following recommendation to the Illinois Supreme Court:

There have been three previous disciplinary actions against the Respondent. In 1981, the Respondent was reprimanded for neglecting client matters and making misrepresentations to clients in cases dating back to 1971.

-52-

In 1987, the Respondent was censured for neglecting other client matters between 1973 and 1984. In 1996, the Respondent was suspended from the practice of law for two years, effective January 8, 1997, and until further order of the Court for neglecting other client matters between 1990 and 1994.

The three prior disciplinary matters when considered with the underlying facts of this matter clearly show a pattern of **serious client neglect for over 25 years**. . . . The long term pattern of misconduct by the Respondent along with his testimony and overall demeanor indicates that he does not comply with his ethical responsibilities and may not understand what they are. He has shown little recognition of the seriousness of his misconduct and little remorse. . . . The attorney does not yet understand the nature and seriousness of his misconduct.

The Supreme Court of Illinois entered the following order:

The motion by the Administrator of the Attorney Registration and Disciplinary Commission to approve and confirm the report and recommendation of the Hearing Board is allowed. Respondent (name omitted), who was suspended from the practice of law for two (2) years and until further order on January 8, 1997, is suspended from the practice of law for eighteen (18) months and until further order of Court, with the suspension commencing on January 8, 1999.

I have, I believe appropriately, taken judicial notice of the public record as to what they concluded as to Mr. G. This court has taken judicial notice of public records, not in the case record, see: <u>U.S. v. Eagleboy</u>, 200 F. 3d, 1137, 1140 (8th

Cir. 1999), where this Court said the Court may take judicial notice of public records. I decline to give "deference," based on what Mr. G said he did, when it is pretty obvious he didn't do it.

The U.S. District Court would not have given deference to the conclusions of the trial court if it had known about Mr. G's now public record. Mr. G's first suspension was in 1996, effective January 8, 1997, some 33 months before the District Court denied his petition for a Writ of Habeas Corpus. Mr. G was suspended the second time on January 29, 1998, some 21 months before his petition was denied. If Hanes had good lawyers, Mr. G's suspension record would have been fully set out in this record a long time ago. How can this be fundamentally fair? It can't be.

## REMAND

It would be appropriate to remand this case to the District Court for further consideration of such things as: allowing the "complete" deposition of Sprouse's counsel to be taken because it does not involve an attorney-client privilege.

The remand would also consider the <u>WEAKNESS</u> of any conclusions that Sprouse or Mr. G are deserving of any credibility and whether or not Sprouse did confess to his psychologist at the Gumbo Institution that Hanes was not involved in the murder and that deference as to what Mr. G said he did should be reviewed based upon his suspension, and the many other things mentioned in this dissent.

I am persuaded that Mr. G's many acts and omissions shown in the record render the results of the trial unreliable and create a reasonable probability that counsel's acts and omissions were outside the wide range of professionally competent assistance and were prejudicial to the defense and absent such ineffectiveness, the outcome would have been different. I emphasize that the outcome would have been different, not that Hanes would be completely exonerated. I would remand this cause back to the District Court directing that that court take a new, clean look at it, use the correct law, possibly send it back to the state courts if that seemed appropriate, and then either grant or deny the writ so that it would again come before this Court. Said decision then could then be fairly and

-54-

properly considered.   The District Court should have the first opportunity to decide the merits of Hanes' federal constitutional claims.  This would certainly be proper under 29 U.S.C. §2106 which permits appellate courts to "require such further proceedings to be had as may be just under the circumstances."

Although I do not urge it, this case could be reversed because all the courts who have had it have made rulings on the attorney-client issue (pages 32 to 39 in this order) that are contrary to clearly established federal law.  (28 U.S.C. §2254(d)).

## CONCLUSION

As set out on page 10 of the majorities' opinion, it states, "we believe Hanes cannot show prejudice within the meaning of <u>Strickland</u> and thus cannot satisfy the second prong of the <u>Strickland</u> test."  That second prong, of course, is prejudice. The <u>Strickland</u> court sets out the test for prejudice as follows:

> The defendant must show that there is a reasonable
> probability that, but for counsel's unprofessional errors,
> the result of the proceeding would have been different.  A
> reasonable probability is a probability sufficient to
> undermine confidence in the outcome.

As set out herein, Mr. G made many errors.  Some of them, which bear directly as to what the jury didn't hear, are repeated here.

One of Mr. G's unprofessional errors was not calling Hanes' mother to testify and thereby letting the jury deliberate thinking Hanes had "confessed" to his mother who wouldn't come to the trial to support Hanes because she knew he was guilty and did not want to commit perjury (T. Tr. p. 635), when in fact, she was "begging" to refute such testimony.

Another of Mr. G's unprofessional errors was not calling Hanes' wife to testify and thereby letting the jury deliberate thinking Hanes was planning to kill his wife for her life insurance money (T. Tr. p. 292) when there was no insurance policy and his wife was sitting outside the courtroom waiting to be called to easily refute this horrible testimony.

-55-

Another of Mr. G's unprofessional errors was not calling Gary Seiner as a witness and thereby letting the jury deliberate believing Hanes was a liar when he said his reason for going to Chicago was to see a friend, and not to split up loot, which allowed the prosecutor to tell the jury, "where is this friend, (Seiner) he wasn't here to testify, I guess he didn't want to perjure himself." (T. Tr. p. 631). It was not strategy not to call them, it was stupidity.

It is logical to conclude that but for Mr. G's unprofessional errors, the result of the proceeding would be different. They were certainly errors "probably sufficient to undermine confidence in the outcome." Those errors clearly had an effect on the judgment.

The bottom line is not, "Is he guilty by deference?" We must go back to Strickland, at 697-98, for the basic test: "Was it fundamentally fair?" The obvious answer is **NO**. When does deference lose to fundamental fairness? It must be here.

Accordingly, I respectfully dissent.


A true copy.


Attest:


CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.